UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 20-137 (NEB/ECW)

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | MEMORANDUM IN SUPPORT OF |
| ) | SECOND MOTION TO SUPPRESS |
| v. ) | EVIDENCE OBTAINED AS A RESULT |
| ) | OF SEARCH AND SEIZURE |
| KEEGAN JAMAAL ROLENC, ) | |
| ) | |
| Defendant. ) | |

On July 16, 2020, after arresting defendant Keegan Jamaal Rolenc on an outstanding federal warrant, the police began to search his vehicle. The search was not a legal inventory search because it accomplished none of the purposes of an inventory search and failed to comply with the procedures of the Minneapolis Police Department. In fact, the evidence establishes that the search was a warrantless search for evidence. Because there was neither probable cause nor exigent circumstances justifying this warrantless intrusion, the fruits of the search should be suppressed.

FACTS

On July 16, 2020, Minneapolis Police Officer William Martin was working with his partner Justin Young in North Minneapolis. T. 8. They received information that Rolenc, the subject of a federal arrest warrant, had been seen in the area of Lowry Avenue and Logan Street. T. 9. Martin and Young located Rolenc's vehicle traveling eastbound on Lowry, and they initiated a traffic stop.

Rolenc stopped his vehicle as ordered to do, and he was taken into custody without incident. T. 10. Rolenc had been driving the vehicle, and a small child was in a car seat in the back. T. 10.

The police searched Rolenc and found approximately $900 in cash.[1] T. 11. He was then placed in Officer Martin's squad car. T. 10-11.

Once Rolenc was secured, Officer Martin began to search the vehicle. "I believe[d] the vehicle was going to be towed and as he had been arrested, I started, I began searching the vehicle," Martin explained. T. 12. No decision had yet been made to tow the vehicle, but Officer Martin "assumed at the time when I started searching it that it was going to be towed." T. 21.

Martin began searching in the front, "in the immediate area that the driver would have had access to." T. 12. In the center console, he found some more cash and a gun. *Id.*

While Officer Martin searched the vehicle, the little boy remained in his car seat. There was a cell phone in the cup holder, and the line was open. T. 23. Martin could hear a voice on the phone. There was a woman on the line who identified herself as the boy's mother. *Id.* She asked if she could come and pick up her son. *See* Def. Ex. 14 at 3:55. She arrived on the scene a few minutes later. T. 24; Def. Ex. 12 at 16:35. When she arrived, the tow truck had not arrived, and the car was still being searched. *Id.;* T. 24.

---

[1] The money was not counted until after the search of the vehicle had begun and the gun had been found. *See* Def. Ex. 15.

Rolenc's car was legally parked, and Ms. Cain was on the scene. T. 26; *see* Def. Exs. 17-19. Nonetheless, after the car was searched, it was impounded. T. 14. That decision was made after the gun was found in the vehicle. T. 27. As Officer Martin explained, once the gun was found, "at that point we're not going to release the vehicle to somebody else." T. 27; *see also* T. 34, 38.

Minneapolis Police policy calls for an inventory to be completed of any vehicle that is towed. *Id.* The tow sheet, in the place to "List Visible Personal Property," states "None."  In fact, at the time of the search, there was $3000 in cash in the car, as well as a gun, a stroller, a car seat, a cell phone, an expensive bottle of cologne, and various other items of personal property. None of those items was included on the tow sheet.

## Discussion

**I.   The Vehicle Search Was Not a Valid Inventory Search**

A warrantless seizure of personal property is *per se* unreasonable unless the government can establish that one of the carefully defined exceptions to the warrant requirement applies. *See, e.g., United States v. Place*, 462 U.S. 696, 701 (1983); *Coolidge v. New Hampshire,* 403 U.S. 443, 454-55 (1971); *United States v. James,* 353 F.3d 606, 613 (8th Cir. 2003). The government bears the burden of establishing that an exception to the warrant requirement applies. *James*, 353 F.3d at 613; *United States v. Kennedy*, 427 F.3d 1136, 1144 (8th Cir. 2005).

One exception to the warrant requirement is an inventory search of a vehicle impounded by the police. *See Kennedy*, 427 F.3d at 1143. The exception is justified

by the governmental interest in completing an inventory of property in police custody: "to protect an owner's property while the automobile is in custody, to ensure against claims of lost, stolen, or damaged property, and to guard police from danger." *Id.* (*citing South Dakota* v. *Opperman*, 428 U.S. 364, 369 (1976). *See* Def. Ex. 20 at 7-702.B1 ("'inventory search' is the search of a vehicle lawfully seized in order to ensure that the vehicle does not contain harmful or dangerous weapons, secure valuable items, and protect against false claims of loss or damage"). Because the police undertake an inventory search in the context of their community caretaking function, not their criminal investigative function, an inventory search may be undertaken without probable cause or a warrant. *See United States v. Taylor*, 636 F.3d 461, 464 (8th Cir. 2011).

To be valid, an inventory search must be conducted pursuant to "standardized criteria", or "established routine" to ensure that "an inventory search . . . not be a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990). As the Eighth Circuit has explained, "[I]nventory searches conducted according to standardized police procedures, which vitiate concerns of an investigatory motive or excessive discretion, are reasonable." *Kennedy*, 427 F.3d at 1143 (*quoting United States v. Marshall,* 986 F.2d 1171, 1174 (8th Cir. 1993)). The Court must evaluate the conduct of the police against Minneapolis police established policy because "the Constitution does not permit police to 'raise the inventory-search banner in an

after-the-fact attempt to justify what was . . . purely and simply a search for incriminating evidence.'" *Id.* (*quoting Marshall,* 986 F.2d at 1175).

The burden is on the government "to produce evidence that impoundment and inventory search procedures were in place and that law enforcement complied with those procedures." *Kennedy*, 427 F.3d at 1144. The government has failed to carry its burden. The evidence is unequivocal that the police used the inventory search exception as a post-hoc pretext for an investigative rummaging of Rolenc's vehicle.

There are four undisputed facts which individually and collectively compel the conclusion that this so-called "inventory search" was a ruse for an unconstitutional search for evidence:

1.   The search did not result in an inventory and failed to comply with MPD policy governing inventory searches;

2.   The search began before a decision had been made to tow the vehicle;

3.   Officer Martin's contemporaneous accounts made clear that he intended the search to be an investigative search incident to arrest;

4.   The search was far more intrusive than the cursory search typical of an inventory search.

A.   The Search Did Not Comply with MPD Policy

It goes without saying that the purpose of an inventory search is to produce an inventory. "The policy or practice governing inventory searches should be designed to produce an inventory." *Florida v. Wells*, 495 U.S. 1, 4 (1990). Without an

inventory, the governmental interest in protecting an arrestee's personal property and protecting the police against false claims of missing property cannot be realized.

For that reason, MPD policy requires that whenever a vehicle is towed, a "Vehicle Impound Report" or tow sheet be completed. The tow sheet must record "all items of significant monetary value." Def. Ex. 20 at 7-702B2a. The inventory must indicate "what items were removed and inventoried and what items were left in the vehicle." *Id.* at 7-702.B2b. When a report is required, such as when the inventory search results in the seizure of contraband, and the vehicle is towed, officers "shall state the reason for towing in the report." *Id.* at 7-701.IIIE; 7-702.B3a.

None of those procedures, the very essence of an inventory search, were followed here. The search of the vehicle resulted in the discovery of $3,000 in cash, T. 13; a firearm, T. 12; a cellphone, T. 23; a pair of running shoes, Def. Ex. 11 at 17:16; a suitcase, *id.* at 13:36; a backpack, *id.* at 14:19; various electronic chargers, *id.* at 15:19; a car seat, T. 28; a stroller, Def. Ex. 11 at 13:25; sunglasses, *id.* at 12:01; and an unopened bottle of Creed cologne in a Nordstrom's bag, *Id.* at 19:31. Yet, the tow sheet did not list any of these items. It did not state what property had been left in the vehicle, and what property had been removed. Def. Ex. 16. According to the tow sheet, the personal property found in the vehicle was "None."

Both the stroller and the car seat were given to Dyann Cain, who came to pick up her son. Def. Ex. 11 at 17:31, 18:56. That transfer of property is not

6

reflected on the tow sheet. There is no indication on the tow sheet that a gun and cash had been seized, or what happened to the cellphone and cologne.

Creed cologne sells at Nordstrom's for $325 to over $1,000, depending on the size. *See* https://www.nordstrom.com/brands/creed--7799?filterByGenderAge=men. Officer Martin conceded that a bottle of cologne should be included in the inventory "[i]f I know it's something expensive." T. 28. But here, the police did know the cologne was expensive. Officer Young, Martin's partner, asked Rolenc whether there was anything of value in the vehicle. Def. Ex. 13 at 22:12. Rolenc answered, "The cologne that I just got." *Id*. Had this been an actual inventory search, this information would have been included in the inventory of property in the vehicle. But given that the police purpose was to search the vehicle for evidence, the cologne, like all the other property in the vehicle, was simply ignored.

A reasonable accounting of the value of the items found in the vehicle would look something like this:

1. Cash         $3000
2. Firearm      $ 250
3. Cologne      $ 400
4. Cellphone    $ 500
5. Car seat     $ 100
6. Stroller     $  50
7. Luggage      $  75
8. Shoes        $  75
9. Sunglasses   $  25
TOTAL           $4,475.

Yet, not one of these items was included in the inventory, in violation of MPD policy. The reason is obvious. This was not an inventory search; it was a ruse to search the vehicle for evidence.

Similarly, neither Officers Martin nor Young stated in their report the reason for the tow of the vehicle, in violation of MPD policy. T. 32-34. Again, the reason is straightforward. The tow was ordered because a gun was found in the vehicle. As is discussed below, the tow was only ordered *after* the gun was found. This was not an inventory search which led to the discovery of a gun. It was the discovery of a gun which then led to a tow.

*United States v. Taylor,* 636 F.3d 461 (8th Cir. 2011), is on all fours with this case. In *Taylor,* the defendant was arrested following a traffic stop. The police decided to tow the vehicle. Pursuant to written police policy, they conducted what they said was an inventory search of the vehicle. During the search, they found hundreds of hand tools, which they listed on the inventory as "misc. tools," and 74 grams of powder cocaine. *Id.* at 463. On appeal, the Eighth Circuit held that this two-word description was not sufficient to be considered an inventory and was "insufficient to remove the inference that the search was investigatory." *Id.* at 465. The court held the so-called inventory "was merely a pretext for an investigatory search." *Id.* at 465. The court reversed the conviction. *See also United States v. Barraza–Maldonado,* 879 F. Supp. 2d 1022, 1033 (D. Minn. 2012) (holding inventory search was pretext for illegal, investigative search because officer did not complete inventory of items in car), *aff'd on other grounds,* 732 F. 3d 865 (8th Cir. 2013); *United States v. Caskey*, 2013 WL 50450 (D. Minn. Jan. 3, 2013) (suppressing search where government failed to establish officer complied with inventory policy and evidence evinced investigative motive); *United States v. Reed*, 319 F. Supp. 3d

1112, 1122 (S.D. Ind. 2018) (inventory search unreasonable where no inventory created).

The inventory required in this case would not have taxed the police nearly as much as in *Taylor*. A template for such an inventory is available on page 7. Such a list could have been assembled in one minute. Yet, the police did not even bother. Their false statement that the personal property in the vehicle was "None" did not comply with MPD policy. Together with the other factors discussed below, it is apparent that the so-called inventory search was nothing but a ruse to allow for an illegal, investigative search. *See United States v. Andrews*, Crim. No. 18-CR-149 (SRN/DTS) at *21 n.9 (D. Minn. Sep. 3, 2019) ("The search of the Yukon was not an inventory search. Nor does Sgt. Pucely's use of the phrase 'inventory search' transform it into one").

### B. The Search Began Before Any Decision Had Been Made to Tow the Vehicle

Within seconds of Rolenc being secured in the squad car, the police began a thorough search of his vehicle. Def. Ex. 11 at 2:28; Def. Ex. 14 at 2:27. As Officer Martin conceded, at the time the search began, no actual decision had been made to tow the vehicle. Rather, Martin simply "believe[d]" and "assumed" the vehicle would eventually be towed. T. 12, 21-22. The decision to tow the vehicle was not made until after the gun and cash had been found in the center console. T. 27.

Although MPD policy requires an inventory search of any vehicle that is being impounded, it does not authorize a search on the mere possibility a vehicle will eventually be towed. *See* Def. Ex. 20 at 7-702.A. None of the caretaking

9

functions which justify an inventory search is called into play until a final decision has been made to impound the vehicle. The search conducted by Officer Martin violated MPD policy because no decision had been made to tow the vehicle at the time the search was conducted.

Moreover, Martin was unable to specify any basis for a tow of the vehicle other than the discovery of the gun. He first stated the vehicle "can't just be left on a busy road." T. 25. Eventually, Martin conceded that the car was legally parked. T. 26; *see* Def. Exs. 18-19. He agreed that one of the options available to the police was simply to leave the car legally parked where it was. T. 26. *See* Def. Ex. 20 at 7-701.C4.

Or, the police could have turned the vehicle over to Dyann Cain, the mother of the boy in the backseat. *See* Def. Ex. 20 at 7-701.C3.  Within moments of Rolenc's arrest, Officer Martin was on the phone with Ms. Cain, who said she would be there in ten minutes to pick up her son. *See* T. 23-24; Def. Ex. 14 at 3:50. She arrived shortly thereafter. T. 24; Def. Ex. 11 at 16:30, 17:30, Def. Ex. 12 at 16:30. Rolenc was arrested at 18:11:21 Zulu time (1:11:21 p.m. local time). Def. Ex. 12 at 1:03. Ms. Cain was on the scene by 18:26:48, 15 minutes later. *Id.* at 16:30. When she arrived, the car was still being searched, and the tow truck had not yet arrived. (The tow was not even ordered until 18:25:09, 1 ½ minutes before Cain arrived). Def. Ex. 11 at 14:45. After checking her identification, Def. Ex. 12 at 20:07, the police released the child, the car seat, and the stroller to Ms. Cain. *Id.* at 16:30-18:30.

10

MPD policy allows the police to release a vehicle "[w]hen another person with a valid driver's license is available at the scene and has the owner's/responsible occupant's permission to take custody of the vehicle, even if the owner/responsible party has been arrested." Def. Ex. 20 at 7-701.C3; T. 26. *See United States v. Reed*, 319 F. Supp. 3d 1112, 1121 (S.D. Ind. 2018) (no basis to impound vehicle where owner arrived on scene before car was towed).

Officer Martin cited one reason why this policy was not invoked: once they found the gun "we're not going to release the vehicle to somebody else." T. 27. Similarly, "once the gun was found in the vehicle," he was "not going to leave that car on the street." T. 34. For that reason, it was towed.

Of course, the government cannot justify a warrantless search of the vehicle on the ground that what was found during the search eventually led to the vehicle being towed. The question is whether there was a basis to search the vehicle at the outset. As relevant here, MPD policy cites six circumstances in which the police may impound a vehicle. *See* Def. Ex. 20 at 7-701.IIIB. The only one even conceivably relevant here is that a vehicle may be impounded when:

> The owner or responsible occupant is arrested . . . and impoundment appears appropriate for safekeeping of the vehicle and its contents, to protect them from theft and damage and to protect the MPD from claims of mishandling, unless prohibited in section [C] below.

Def. Ex. 20 at 7-701.IIIB.6. The policy makes clear that the police "shall **not** impound a vehicle **solely for safekeeping** when another driver is available to take the vehicle or the vehicle is legally parked. *Id.* at 7-701.C3-4 (emphasis in original). Until the police found the gun, therefore, there was no basis to tow Rolenc's car.

11

In fact, while the search was going on, the police had already *rejected* the need to impound the vehicle solely for safekeeping. In a discussion between officers while the car was being searched, one officer stated as follows:

> You can search the car incident to arrest. If there's nothing in it, and he can arrange or the wife can arrange for someone to come get it, we don't even have to tow it. Maybe it can be legally parked in E and L [?] or something. Your call.

Def. Ex. 12 at 7:29. A few minutes later, the police made the final decision to tow the vehicle. Def. Ex. 11 at 11:09 ("We are gonna tow it and stuff like that").

MPD policy does not require the police to ask an arrestee whether he wants to make his own arrangements for the vehicle. But here no arrangements needed to be made. The vehicle was already legally parked, and Ms. Cain was already on the scene. But regardless, the police certainly had discretion not to tow the vehicle in these circumstances, just as the officer quoted above recognized. As Officer Martin testified, the decision to tow the vehicle, rather than to turn it over to Ms. Cain or leave it legally parked, was based solely on the discovery of the gun. There is no evidence the police had any intention to tow the vehicle before the gun was discovered.

    C.    The Search Was an Investigative Search Incident to Arrest

As noted above, at the time the car was being searched, the police believed the search was incident to arrest. *See* Def. Ex. 12 at 7:29 ("You can search the car incident to arrest"). Unlike an inventory search, a search incident to arrest is an investigative search for evidence and dangerous weapons.

Officer Martin similarly understood the search of the vehicle to be incident to arrest. In his statement of "Judicial Probable Cause," written to be incorporated into a criminal complaint and submitted to the court under oath, Martin wrote, "Officers verbally identified the arrested party, . . . and he was taken into custody. *Search incident to arrest of the immediate area* revealed a large sum of U.S. currency and a loaded handgun in the center console." T. 29-30 (emphasis added). In his Public Narrative of the incident, Martin wrote, "*Search incident to arrest* revealed a loaded handgun in the immediate area of the driver and only adult in the vehicle." T. 31 (emphasis added). And in his non-public narrative, Martin stated, "After Keegan was out of the vehicle, I began checking the front area of the vehicle that Kegan had immediate access to *due to his arrest*." T. 31 (emphasis added).

MPD policy requires the police to document the legal justification for a search of a vehicle. *See* Def. Ex. 20 at 7-702.B3-4. Here, the only justification Officer Martin gave for the search was that it was conducted incident to Rolenc's arrest. T. 31-32. Never once, until he was testifying under oath before this Court, did he claim he was conducting an inventory search.

But the Court need not rely on what Martin wrote after the fact. Thanks to his body-worn camera, we know exactly what he had in mind while the incident was unfolding in real time. While counting the money seized only moments earlier during the search, another officer called him. Martin told the caller, "search is incident to arrest. The gun was in the center console." Def. Ex. 15 at 10:55.

13

It is beyond dispute that at the time the search was executed, the police understood it to be a search incident to arrest, that is, a search for evidence. Not surprisingly, the government does not even attempt to justify the search on that basis because a search incident to arrest was plainly illegal in the circumstances of this case. *See* Doc. No. 63.

In *Arizona v. Gant*, 556 U.S. 332, 351 (2009), the Supreme Court held that the police may only search a vehicle incident to the arrest of a recent occupant "if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." If neither of those justifications exists, the search is unconstitutional. *Id.*

Neither justification existed here. It is undisputed that Rolenc was handcuffed behind his back and secured in a squad car at the time of the search. Moreover, his arrest was pursuant to a federal arrest warrant for possession of a gun and drugs, both of which had been seized five months earlier. Thus, there was no basis to believe the car would contain evidence of the offense of arrest.

In the face of *Gant,* Martin's stopgap reliance on the inventory search exception is exposed for what it is: a cynical, post-hoc rationalization for an illegal search. This is precisely the sort of "'after-the-fact attempt to justify what was . . . purely and simply a search for incriminating evidence,'" which the Eighth Circuit has repeatedly condemned. *Kennedy*, 427 F.3d at 1143 (*quoting United States v. Marshall,* 986 F.2d at 1175 (8th Cir. 1993)); *United States v. Ketzner*, 2021 WL

493383 at *5 (E.D. Mich. Feb. 10, 2021) ("neglecting to inventory any item signals a flagrant disregard of [defendant's] property rights and evidences [the officer's] bad faith and ulterior motive for his so-called inventory search.")

      D.      The Intrusiveness of the Search Establishes that It Was a Search for Evidence

The manner in which the search was executed provides further evidence that Martin should be taken at his word—this was a search for evidence, not an inventory search. Martin began his search by ignoring the Nordstrom's bag on the front seat, instead going directly to a compartment under the front passenger seat and then to the center console. *See* Def. Ex. 11 at 1:40-2:55. The Nordstrom's bag should have been the first item to be inventoried. Instead, Martin ignored it.

The remainder of the search plainly went beyond what would be required to identify valuables and look for weapons. Officer Hamilton searched with a flashlight under the floormats. Def. Ex. 11 at 8:15. He pried plastic pieces off the dashboard. *Id.* at 8:48. These are not techniques reasonably designed to locate valuables. *See also id.* at 10:15 (examining floor with flashlight). *See United States v. Kennedy,* 427 F. 3d 1136, 1144 (8th Cir. 2005) (affirming suppression because government failed to prove that lifting loose car speaker out of vehicle was consistent with police inventory policy); *United States v. Best*, 135 F.3d 1223, 1225 (8th Cir. 1998) (search inside door panel exceeded scope of inventory search and was unconstitutional). He reviewed paperwork in the vehicle, although it was apparent the papers were neither weapons nor valuables. *Id.* at 12:04, 15:35-16:46. Hamilton photographed

15

the paperwork he found in the back of the car, again far outside the scope of an inventory search.

The search conducted by the police went far beyond the parameters of an inventory search for valuables and weapons, and it did not produce an inventory. The reason is apparent—the inventory search was a ruse for a warrantless rummaging for evidence. The search was unconstitutional.

II.  Rolenc's Arrest and the Resulting Search of His Vehicle Is a Fruit of the Poisonous Tree of the Earlier Illegal Search

On February 2, 2020, Mr. Rolenc was stopped by the Minneapolis Police in North Minneapolis. Based on a false claim that they smelled marijuana, the police ordered him out of the vehicle and searched it. The evidence establishes that the police lied. Mr. Rolenc does not use marijuana, and he tested negative for marijuana 3 days later. At a minimum, given the many questions raised by the testimony, the government failed to carry its burden to establish that there was a legal basis for the stop and warrantless search of the vehicle.

Rolenc moved to suppress the February 2 search. That motion is currently pending before the Court. Doc. Nos. 26, 46, The federal warrant which led to Rolenc's arrest on July 16, 2020 was the direct result of the February 2 search. On July 14, 2020, a federal grand jury charged Rolenc with drug and firearm offenses arising from the evidence seized on February 2, 2020. Doc. No. 1.

Under the fruit-of-the-poisonous tree doctrine, evidence "obtained directly or indirectly through the exploitation of police illegality" is subject to exclusion. *United States v. Simpson*, 439 F.3d 490, 493 (8th Cir. 2006) (*quoting Hamilton v. Nix,* 809

F.2d 463, 465 (8th Cir. 1987)). Here, the illegal search on February 2 led directly to Rolenc's arrest on July 16. The arrest was for the items seized in the February 2 search. Had the illegal search not occurred on February 2, Rolenc would not have been arrested or searched on July 16.

Thus, completely independent of the fact that the July 16 search was an unconstitutional warrantless search that cannot be saved by an after-the-fact claim of an inventory search, the search is also subject to suppression as a fruit of the poisonous tree with respect to the February 2 search.

Conclusion

For the first time at the evidentiary hearing, Officer Martin claimed that he conducted an inventory search of Rolenc's vehicle. His statements at the time tell a different story: the search was a search incident to arrest, which was plainly illegal under *Gant*. His claim of an inventory search is nothing but a ruse. At the time of the search, no decision had been made to tow the vehicle. The police only decided to tow the vehicle because a gun was found in it. Had the illegal search not been conducted, the police would have left the vehicle legally parked or turned it over to Ms. Cain, as they were planning to do. The police failed to itemize more than $4000 of cash and personal property in the vehicle, in violation of MPD policy. And the intrusiveness of the search was consistent with an investigative search for evidence, not an inventory search.

For the foregoing reasons, the claimed inventory search was an after-the-fact rationalization for an illegal warrantless search. Further, the search was the fruit of

the illegal February 2 search. For the foregoing reasons, this Court should recommend that Mr. Rolenc's second motion to suppress be granted.

Dated:  June 22, 2021

                                Respectfully submitted,

                                *s/ Robert D. Richman*
                                ROBERT D. RICHMAN
                                Attorney ID No. 226142
                                P.O. Box 16643
                                St. Louis Park, MN  55416
                                (651) 278-4987

                                Attorney for Defendant