# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES, | Case No. 20-CR-137 (NEB/ECW) |
| Plaintiff, | |
| v. | ORDER ON REPORT AND RECOMMENDATION |
| KEEGAN JAMAAL ROLENC, | |
| Defendant. | |

This case comes before the Court to address objections to a report and recommendation's resolution of Fourth Amendment issues. Minneapolis police officers stopped and searched Defendant Keegan Jamaal Rolenc in February 2020 and again in July 2020. Rolenc asked the Magistrate Judge to suppress the fruits of those searches, alleging that each search violated the Fourth Amendment. In a Report and Recommendation, United States Magistrate Judge Elizabeth Cowan Wright recommended that (1) Rolenc's motion to suppress evidence obtained as a result of the February 2020 stop should be granted in part and denied in part; and (2) Rolenc's motion to suppress evidence obtained as a result of the July 2020 stop should be denied. (ECF No. 77 ("R&R").) The government and Rolenc both object to the R&R. (ECF No. 85; ECF No. 81.) For the reasons below, the Court overrules the government's objection, sustains Rolenc's objection, and accepts the R&R as modified below.

# BACKGROUND

The R&R details the facts and procedural history of this case, (R&R at 2–41), which are undisputed. The Court briefly lays out the facts necessary to rule on the objections.[1]

## I.      The February 2020 Stop

Rolenc's first motion relates to evidence obtained through a search and seizure by Officers Fuller and Ledman after a traffic stop. (R&R at 2, 41.) On the evening of February 2, 2020, Officers Fuller and Ledman pulled Rolenc over for rolling through a stop sign. (*Id.* at 6.) Officer Fuller approached Rolenc's driver-side window while Officer Ledman approached the passenger-side window. (*Id.* at 7.) Rolenc rolled down his driver-side window to speak with Officer Fuller. (*Id.*) On request, Rolenc rolled down his passenger-side window. (*Id.*)

From the passenger side, Officer Ledman asked Rolenc questions about the traffic violation, his driver's license, and his insurance information. (*Id.*) Officer Ledman then asked Rolenc about marijuana and if Rolenc had any marijuana in the car. (*Id.* at 7–8.) Officer Ledman testified that he smelled marijuana coming from Rolenc's car when Rolenc rolled down the passenger-side window, but his testimony was inconsistent on whether he smelled marijuana *smoke* or another form of marijuana. (*Id.* at 8–10.) Officer Ledman was also unable to testify as to the strength of the marijuana smell. (*Id.* at 10.)

---

[1] In so doing, the Court cites the R&R and incorporates the citations it contains.

After asking Rolenc about marijuana in the car, Officer Ledman said to Officer Fuller, "I smell it." (*Id.*) Officer Fuller replied, "I smell it, too." (*Id.*) The officers asked Rolenc to step out of his car and handcuffed him. (*Id.*) The officers performed a pat-down search of Rolenc, placed him in the squad car, and searched Rolenc's car. (*Id.* at 10–11.)

During the search, body camera footage shows the officers recovering a bag of white powdery substance from the car, which Officer Ledman testified was consistent with cocaine or heroin. (R&R at 11.) Officer Ledman continued searching the car and said, "Where's that weed—that weed smell coming from?" (*Id.*) He then shined his light on the floor and under the seat and said, "There's little stems and seeds." (*Id.* at 12.) The officers, however, did not bag the "stems and seeds" as evidence. (*Id.*) The officers did not find any marijuana or marijuana paraphernalia while searching the car's interior, so the officers continued to the trunk. (*Id.* at 13.) When Officer Ledman opened the truck, he did not note a marijuana odor. (*Id.* at 14.)

The trunk had several items, including a closed mason jar that was empty, save for some small particles. (*Id.* at 13.) When Officer Ledman began to open the jar, he said, "So, here's a—an empty mason jar, with, looks like weed, probably. . . . So I'm wondering if, so he probably had some in the car, that's why we smelled—oh yeah."[2] (*Id.* at 13–14.) Officer Ledman "immediately recognized [the smell] to be marijuana" when he opened the jar, but he did not smell marijuana coming from the jar before opening it. (*Id.*) After

---

[2] Officer Ledman said the "oh yeah" as he opened the mason jar. (R&R at 14.)

he found the mason jar, Officer Ledman continued the search saying, "But there's gotta be more weed in here." (*Id.*) Other than the contents of the mason jar, the officers did not find marijuana in Rolenc's car. (*Id.* at 14–15.) After concluding their search, the officers took Rolenc from the squad car and searched him again.[3] (*Id.*) They, again, did not find any marijuana. (*Id.* at 15.)

At the time of the February 2020 stop, Rolenc was on probation for an unrelated offense. As a condition of his probation, Rolenc was required to submit to random urinary analysis tests. (R&R at 18.) Rolenc submitted to a urinary analysis test on February 6, 2020. The marijuana result was negative, with a reading of 0.0. (*Id.*) At the hearing before the Magistrate Judge, Rolenc's friends and family testified that, due to his asthma, Rolenc does not smoke marijuana, will not allow smoking in his car, and will not be around people who smoke. (*Id.* at 19–25.)

Also at the hearing, a forensic science consultant testified as an expert for the defense. (*Id.* at 26.) He explained that there is a significant difference between the odor of fresh marijuana and burned marijuana with the latter being a "very recognizable and strong" odor. (*Id.* at 26–30.) Dry or "fresh" marijuana, on the other hand, smells like "dried plant material"—but does not smell as strong as oregano or basil. (*Id.* at 27.) He

---

[3] Officers Ledman and Fuller commented that the squad car "smell[ed] like a bunch of weed," "reek[ed] like weed," and smelled "strong" of marijuana. (R&R at 53 (brackets in original).) Officer Ledman testified that he could not recall the conversation in the squad car or if the marijuana smell in the squad car was or was not strong. (*Id.* at 16.)

stated that dried marijuana's odor, though, can change depending on the amount of resin. (*Id.*) In the expert's opinion, someone would be unable to smell marijuana through a hypothetical mason jar with the lid secured and with particles of dried marijuana inside. (*Id.* at 28.)

The expert also testified to the length of time marijuana toxins would be detected in a urinary analysis. (*Id.* at 28–30.) If someone smoked marijuana or was around second-hand marijuana smoke enough to smell "strongly of marijuana" on his clothes and in his car, the expert expected some level of cannabinoid to be detected in a urinary analysis. (*Id.* at 28–29.)

Although the officers did not find any marijuana in Rolenc's car, they did find a handgun, which is why the case is in federal court. (*Id.* at 16.) Though Rolenc was released, he was later charged by indictment for felony possession of a firearm. (ECF No. 1.)

## II.    The July 2020 Stop

The July 2020 stop involved Minneapolis Police Officers Marin and Young, who were on a focused detail in North Minneapolis. (R&R at 31.) Officers Marin and Young were informed of Rolenc's federal warrant. (*Id.*) They were on the lookout for Rolenc, whom they believed may be in possession of guns and driving a blue Kia. (*Id.*) The officers located Rolenc's car and initiated a stop on the basis of the warrant. (*Id.*) This was

considered a "high risk stop," and although Officer Martin and Young were initially the only officers there, multiple squads arrived soon after. (*Id*.)

Rolenc pulled his car over into a parking area, after which he "was taken into custody, searched, and put into the squad car."[4] (*Id.* at 31.) Officer Martin began searching Rolenc's car as soon as he was in the squad car. (*Id.* at 35.) Officer Martin testified that he "assumed at the time when [he] started searching [the vehicle] that it was going to be towed" although at that point, no one had said that the car would be towed, and he did not remember if it was him or Officer Young who said "hey, we got to get a tow going." (*Id.*)

Despite his stated assumption about the tow, Officer Martin justified his search of Rolenc's car as a search incident to arrest. (R&R at 35, 39.) Officer Martin searched the part of the car where Rolenc "would have had immediate access to," because a search incident to arrest is "for weapons, contraband, and evidence and includes a search of the person and the area in the person's immediate control." (*Id.* at 35.) There, Officer Martin recovered a large sum of money and a firearm from the center console. (*Id.*) On the

---

[4] Rolenc's two-year-old son was in the car when Rolenc was stopped and was left in the car when Rolenc was put into the squad car. (R&R at 32.) Rolenc was on the phone with the child's mother when he was pulled over, and Officer Martin gave her the address; she said she would be there in 10 minutes. (*Id.*) The child's mother arrived soon after the conversation, which was before a tow truck arrived. (*Id.*) She took the child along with the stroller and car seat that had been in the car. (*Id*. at 33.) Officer Martin was unsure whether anyone asked if she would be willing to take Rolenc's car. (*Id.*)

passenger-side, he found a Nordstrom bag with a new bottle of cologne. (*Id.* at 36.) Officer

Martin also found a pair of sneakers and a cell phone (along with a child, stroller, and car

seat) in the back of the car. (*Id.*)

After finding the money, body camera footage captured fragments of Officer

Martin saying into a radio or phone, "we just got inventory here in a little bit, we're gonna

need a money count." (*Id.*) The body camera also captures two officers having the

following conversation:

> 1: Will, is there any, um, is there any drugs or anything? Otherwise you
> can let him keep his money.
> 2: Uh not sure yet. Ah if that's the case then we'll finish checking the car
> before we tow it. And then ah, if there's no dope we can give it back to
> him.
> 1: Yup, you can search the car incident to arrest. If there's nothing in it, I—
> and he can arrange or the wife can arrange for someone to come get it, ah,
> we don't even have to tow it. Maybe it can be legally parked in E and L or
> something. But your call.
> 2: OK, nope that's fine, we're just going to go on with what we usually do
> if that's the case or whatever you got going, that's what we'll do.

(*Id.* at 37.) It appears from the evidence that Officer Martin is officer 2. (*Id.* at 36–37.)

A few minutes later, the body camera footage shows Officer Martin saying, "We

are going to tow it, and stuff like that." (*Id.* at 37.) Then, several minutes later, someone

can be heard saying, "When you guys are done, if Justin hasn't started, can you start a

tow?" (*Id.*), to which someone else responds and asks, "Hey Wilson, can you start a tow?"

(*Id.*) A request is then radioed asking, "Can you please start a white tag booking tow

. . . ?" (*Id.* at 37–38.) About five minutes later, an officer asks whether a tow truck has been

called and whether a "sheet" has been done, to which the officer replied that they were working on the tow sheet. (*Id*. at 38.)

Around that time, the officers asked Rolenc whether there was anything valuable in his car, and Rolenc said there was recently purchased cologne in a Nordstrom bag. (R&R at 38.) Minneapolis Police Department Policy (the "Policy") requires officers to record all valuable items on the tow sheet. (Def. Ex.[5] 20.) Yet the officers did not include any items from Rolenc's car on the tow sheet.[6] (Def. Ex. 16.) Officer Martin's reports also did not indicate the reason for the tow.[7] (R&R at 39.)

The Policy requires officers to indicate the basis for a vehicle search on their reports. (*Id*.) Officer Martin wrote in three reports about the incident that the search was one incident to arrest. (*Id*.) For example, in the "Judicial Probable Cause" report, Officer

---

[5] Defense Exhibits were submitted to the Magistrate Judge for the motions hearing.

[6] The tow sheet also did not list the cell phone or sneakers found in the car. (R&R at 36, 38; Def. Ex. 16.) It is unclear if these were valuable items.

[7] Officer Martin stated that it was not inevitable that Rolenc's car would, in fact, be towed. (R&R at 39.) This is consistent with department policy, which gives officers discretion in deciding to impound cars. The Policy provides that one circumstance when an officer may impound a vehicle is when "[t]he owner or responsible occupant is arrested, absent, or otherwise incapacitated and impoundment appears appropriate for the safekeeping of the vehicle and its contents, to protect them from theft and damage and to protect the MPD from claims of mishandling . . ." (*Id*. at 39–40.) The Policy provides that any vehicle to be towed must be inventoried, so an inventory search is conducted when a vehicle is going to be towed. (*Id*. at 40.)

Martin described the search as a "search incident to arrest."[8] (*Id.*) In a public narrative of the incident, Office Martin wrote that the "*search incident to arrest* revealed a loaded handgun in the immediate area of the driver and only adult in the vehicle." (*Id.* at 39 (emphasis added).) At no point did Officer Martin write that the search was an inventory search. (*Id.*)

## ANALYSIS

### I.    Standard of Review

The Court reviews the portions of the R&R to which Rolenc and the government object *de novo*. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(3); *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (per curiam).

### II.    Motion 1: February 2020 Stop

Rolenc's first motion relates to the February 2020 stop and seeks suppression of all evidence seized in the February stop and everything seized thereafter, as fruits of that stop. (R&R at 41; ECF Nos. 26, 46.) Rolenc argued that because Officers Fullman and Ledman searched his car without a warrant or probable cause, the search was illegal, and

---

[8] One report stated the following regarding probable cause:

> [O]fficers observed a listed vehicle with the arrested party in it. Officers knew the driver to be wanted under a federal warrant for weapons offenses. Officers verbally identified the arrested party who confirmed his name, and he was taken into custody. Search incident to arrest of the immediate area revealed a large sum of U.S. currency and a loaded handgun in the center console. The arrested party was booked at HCJ for the federal warrant.

(R&R at 38–39 (quoting ECF No. 73 at 30).)

the evidence recovered must be suppressed. (R&R at 11, 27.) The government argued that the officers had probable cause to search Rolenc's car when they smelled marijuana. (*Id.* at 41.)

Magistrate Judge Wright recommended granting parts 1–3 of Rolenc's first motion. (*Id.* at 57–58.) The government objects to (1) the determination that Officer Ledman's testimony about smelling marijuana in Rolenc's car during the February 2020 stop was not credible; (2) the determination that the search of Rolenc's car was therefore invalid; and (3) the subsequent recommendation that the evidence recovered from Rolenc's car, including the gun and cocaine, must be suppressed. (ECF No. 85 at 1.) The government also asks this Court for an evidentiary hearing where the government will recall Officer Ledman and present additional testimony from Officer Fuller. (*Id.* at 2.) Following a *de novo* review of the evidence, this Court adopts the Magistrate Judge's credibility determination and denies the government's motion for an evidentiary hearing.

A district court may, but is not required to, hold a rehearing on the objected-to issues. *United States v. Raddatz*, 447 U.S. 667, 674–76 (1980). "If the district court finds there is a problem as to the credibility of a witness or witnesses or for other good reasons, *it may, in the exercise of its discretion*, call and hear the testimony of a witness or witnesses in an adversary proceeding. It is not required to hear any witness and not required to hold a *de novo* hearing of the case." *Id.* at 676 (emphasis in original) (citations omitted). The government was given the opportunity to present witnesses and evidence during an in-

person motion hearing.[9] (R&R at 2.) This Court does not need an additional hearing to review this evidence.

During the hearing, Officer Ledman testified and body camera videos were presented. (*Id.* at 50.) Officer Fuller did not testify. (*Id.* at 45.) The government contends that Officer Fuller should be allowed to testify at a new hearing so that the Court can hear his "versions of the events." (ECF No. 85 at 10.) But the government already had an opportunity to present Officer Fuller's testimony—at the in-person motion hearing. The government presents no argument that it was denied the opportunity to adequately question Officer Ledman or present Officer Fuller's testimony. (ECF No. 85.) The government is not entitled to a new hearing simply because it is unhappy with the results of the first one.

Having concluded that the government is not entitled to a new hearing, the Court will consider the evidence presented during the in-person motion hearing and will make a *de novo* determination on the motion.

Under the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to

---

[9] This hearing took place November 4, 2020, before Magistrate Judge Wright.

brief investigatory stops of persons . . . that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)).

In February 2020, Officers Fuller and Ledman stopped Rolenc for a traffic violation. (R&R at 42.) In his first motion, Rolenc argued that the traffic stop violated the Fourth Amendment. (ECF No. 46 at 12–19.) Magistrate Judge Wright concluded that the officers had probable cause to conduct the stop after Rolenc rolled through a stop sign. (R&R at 43.) Neither Rolenc nor the government objects to this conclusion, and this Court agrees.

Following the traffic stop, Officers Fuller and Ledman searched Rolenc's car after declaring they smelled marijuana inside the car. (R&R at 10–15.) It is settled law in this Circuit that an officer has probable cause to conduct a search for drugs after smelling marijuana in a car during a proper traffic stop. *United States v. Smith*, 789 F.3d 923, 928 (8th Cir. 2015). It is the government's burden to show by a preponderance of the evidence that officers did in fact have probable cause to search Rolenc's car. *See United States v. Guzman*, 507 F.3d 681, 687 (8th Cir. 2007) ("The government bears the burden of proving that an exception to the warrant requirement exists.") (citations omitted).

Rolenc contends that the officers did not smell marijuana in his car. (ECF. No. 46 at 1.) In determining whether the marijuana smell established probable cause to search a car, the Court must first determine if the officer's testimony is credible. *Smith*, 789 F.3d at 929. Because Officer Fuller did not testify, the Court weighs the credibility of Officer

Ledman's testimony combined with the other evidence presented. Like the Magistrate Judge, the Court finds that Officer Ledman's testimony that he smelled marijuana through Rolenc's passenger-side window not to be credible. Thus, the government has not met its burden to show probable cause existed to search Rolenc's car following the February 2020 stop.

This Court considers the witness credibility factors discussed in *Holloway v. Wittry* which reflect the Eighth Circuit's understanding of the credibility determination. The factors are as follows:

> (1) the interest of the witness in the result of the trial; (2) the witness' relation to any party in interest; (3) the witness' demeanor upon the witness stand; (4) the witness' manner of testifying; (4) the witness' tendency to speak truthfully or falsely, including the probability or improbability of the testimony given his or her situation to see and observe; (5) the witness' apparent capacity and willingness to truthfully and accurately tell what he or she saw and observed; and (6) whether the witness' testimony is either supported or contradicted by other evidence in the case.

842 F. Supp. 1193, n.11 (S.D. Iowa 1994) (citing *United States v. Phillips*, 522 F.2d 388, 391 (8th Cir. 1975)); *United States v. Merrival*, 600 F.2d 717, 719 (8th Cir. 1979); *Clark v. United States*, 391 F.2d 57, 60 (8th Cir. 1968). The most relevant factor here is whether Officer Ledman's testimony is supported or contradicted by other evidence in the case.

Overall, the evidence of the case contradicts Officer Ledman. From the body camera footage, the marijuana smell seemed so apparent that the officers stated the marijuana odor "reeked" and smelled "strong" in the squad car after Rolenc had been in custody for 40 minutes. (R&R at 15, 53.) The officers noted the strength of the marijuana

odor multiple times during the incident. But the officers did not recover anything in Rolenc's car that would smell like marijuana when the officers initially stopped Rolenc.[10] And Officer Fuller, who approached Rolenc's car first, did not mention the marijuana smell until after Officer Ledman asked if Officer Fuller smelled it. (*Id.* at 10.) Officer Ledman's testimony was also inconsistent about the marijuana odor's strength, (*id.* at 10, 16), or whether he smelled raw marijuana or marijuana smoke. (*Id.* at 8–9.)

Officer Ledman stated he saw "little stems and seeds" on the floor of the car, (*id.* at 12), but he did not bag the "stems and seeds" as evidence. Though the body camera footage supports Officer Ledman's testimony that the mason jar found in the trunk smelled like marijuana once opened, the evidence does not suggest that the mason jar's marijuana smell is what the officers claimed to smell when they stopped Rolenc and decided to search his car. The officers also continued to search the car after finding the mason jar, saying, "but there's gotta be more weed in here." (*Id.* at 13–14.) The forensic science consultant opined that a mason jar with the lid secured and with dried marijuana particles would not exude a strong marijuana odor. (*Id.* at 28.) No evidence rebuts this opinion.

Moreover, Rolenc's urinary analysis was 0.0 for cannabinoid. (*Id.* at 10.) As the forensic science consultant testified, if someone smoked marijuana or had been around

---

[10] It is axiomatic that if the officers did not recover something that would smell like marijuana at the time of the initial stop, they did not recover anything that would smell of marijuana *40 minutes* after having Rolenc in custody.

second-hand marijuana smoke long enough to smell "strongly" of marijuana, some level of cannabinoid should be detected in a urinary analysis. (*Id.* at 28–29.) The urinary analysis results, combined with the lack of marijuana and marijuana paraphilia and Officer Ledman's inconsistent testimony, contradicts Officer Ledman's testimony that the officers smelled marijuana in Rolenc's car when the officers pulled Rolenc over.

The R&R presents several cases that, although not binding on this Court, are persuasive. In *United States v. Shields*, for example, the police officer saw two inch-long marijuana stems on the defendant's leg and could smell the "strong, obvious odor of marijuana emanating from the vehicle's interior" when the defendant rolled down the window. No. 05-20433-B, 2007 WL 4481147, at *3 (W.D. Tenn. Dec. 18, 2007). The officers "found no rolling papers, roach clips, marijuana that appeared to have been smoked, or other evidence showing that Defendants had been smoking in the vehicle." *Id.* at *4. The court found that the officer's testimony about the marijuana smell was not credible because there was no objective evidence to indicate the defendants had smoked marijuana in the vehicle, and there was no evidence presented to suggest a few small stems and seeds would the strong marijuana odor. *Id.* at *5 (citing *United States v. Mercadel*, 75 F. App'x 983 at *4–5 (5th Cir. July 1, 2003) (failure of police to find any evidence of recently smoked marijuana supported court's conclusion that officer's testimony that he smelled marijuana was not credible)).

15

The facts before this Court are distinct from *United States v. Johnson*, in which a court in this district denied a suppression motion when the police officer testified that he smelled "fresh" marijuana coming from the vehicle and noticed green flakes resembling marijuana on the defendant's shirt. No. 14-CR-130 (SRN/SER), 2014 WL 5860478, at *1 (D. Minn. Nov. 12, 2014). In *Johnson*, the officer also noted that the defendant was acting nervous, had his chair leaned unusually far back, and when the officer approached the car a second time, there was a new smell of "some type of deodorizer." *Id.* at *14. The officer searched the car and found a mason jar containing marijuana in the center console. The court found the officer credible, and, under the circumstances, that there was probable cause to search the car. *Id.* The officer in *Johnson* was consistent about the marijuana smell, and there was additional evidence leading him to believe there was marijuana in the car.

Unlike Officer Ledman, the officer in *Johnson* believed the defendant had marijuana in his car for several reasons and consistently testified about smelling a "fresh" marijuana odor. *Id.* at *10. Similar to the officer in *Shields*, Officer Ledman found no objective evidence to indicate that he would have smelled a "strong" marijuana smell. Officer Ledman's testimony was inconsistent about the strength of the odor or whether he smelled marijuana smoke or raw marijuana. (R&R at 8–9, 16.) And his partner, Officer Fuller only smelled marijuana after Officer Ledman's questioning. (*Id.* at 10.)

16

Overall, Officer Ledman's testimony is not credible because it is overwhelmingly contradicted by the other evidence, and the government has not met its burden to show that the officers had probable cause to search Rolenc's car on February 2, 2020. The evidence seized from the car on February 2, 2020, must be suppressed.

Due to the Court's conclusion about the February 2 stop, the evidence seized pursuant to a search warrant of Rolenc's car on February 4, 2020,[11] in the police impound lot and the evidence from the three cell phones recovered on February 2 must also be suppressed, because they are fruits of the poisonous tree.

The "fruit of the poisonous tree" doctrine provides that evidence obtained "directly or indirectly through the exploitation of police illegality" is inadmissible. *United States v. Simpson*, 439 F.3d 490, 493 (8th Cir. 2006). If the evidence is obtained by an independent and lawful source "wholly independent of any constitutional violation," the evidence is admissible. *Nix v. Williams*, 467 U.S. 431, 443 (1984). The police officers did not obtain the evidence collected on February 4, 2020, or from the cell phones through independent, lawful sources, (R&R at 58), so the evidence must be suppressed as fruit of the poisonous tree.

Rolenc also argues in his first motion that the evidence related to Rolenc's arrest during the July 2020 stop should be excluded as is fruit of the poisonous tree because the

---

[11] The search warrant was issued for a Rolenc's car, a silver VW Jetta with MN license plate 649-XEX. (R&R at 16.)

February 2020 stop was unconstitutional. (ECF No. 26.) The Magistrate Judge denied this aspect of Rolenc's motion. Neither Rolenc nor the government object to the Magistrate Judge's finding that the officers stopped Rolenc during the July 2020 stop pursuant to the officers' good faith belief that they were executing a proper federal warrant. The Court agrees with the Magistrate Judge's determination. Therefore, the Court accepts the R&R finding that the items recovered during the July 2020 stop were not fruits of the poisonous tree from the February 2020 unreasonable search.

### III.   Motion 2: July 2020 stop

Rolenc's second motion seeks suppression of the evidence seized from Rolenc's car following the July 2020 stop. (ECF No. 57.) Magistrate Judge Wright recommended that Rolenc's motion be denied because the search qualified for the inventory search exception. (R&R at 70.) Rolenc objected to the Magistrate Judge's recommendation. (ECF No. 81.) The Court sustains Rolenc's objection because it finds that Officer Martin's search was not an inventory search. Further, because Officer Martin did not have probable cause to search Rolenc's car and because no other exception applies, the search was unconstitutional under the Fourth Amendment, and the evidence recovered from the search of the car must be suppressed.

"The Fourth Amendment proscribes all unreasonable searches and seizures, and it is the cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth

Amendment—subject only to a few specifically established and well-delineated exceptions.'" *United States v. Taylor*, 636 F.3d 461, 464 (8th Cir. 2011) (citing *Mincey v. Arizona*, 437 U.S. 385, 390 (1978)). One such exception includes the inventory search which allows law enforcement officials to "inventory the contents of a lawfully impounded vehicle without a warrant or probable cause." *Id.* (citing *United States v. Rowland*, 341 F.3d 774, 779 (8th Cir. 2003)).

An inventory search is not subject to the warrant requirement because such a search is conducted "[i]n the interests of public safety as part of what the Court has called 'community caretaking functions'" of the government. *South Dakota v. Opperman*, 428 U.S. 364, 368 (1976) (citing *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)). "[I]nventory procedures serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Florida v. Wells*, 495 U.S. 1, 4 (1990) (citing *Colorado v. Bertine*, 479 U.S. 367, 376 (1987)); *United States v. Williams*, 777 F.3d 1013, 1015 (8th Cir. 2015) ("It is 'well-settled' law that a 'police officer, after lawfully taking custody of an automobile, may conduct a warrantless inventory search of the property to secure and protect vehicles and their contents within police custody.'") (citing *United States v. Rehkop*, 96 F.3d 301, 305 (8th Cir. 1996). "When the government seeks to introduce evidence that was seized during a warrantless search, [the government] bears the burden of proving that the search

qualifies for an exception under the Fourth Amendment." *United States v. Marshall*, 986 F.2d 1171, 1173 (8th Cir. 1993) (citation omitted).

The inventory search exception was created for police officers to protect a vehicle and its contents when the vehicle has been taken into police custody. *Wells*, 495 U.S. at 4. An inventory search "must not be a ruse for a general rummaging in order to discover incriminating evidence." *Id.* And the "individual police officer must not be allowed so much latitude that inventory searches are turned into 'a purposeful and general means of discovering evidence of a crime.'" *Id.* (citing *Bertine*, 479 U.S. 376).

That Officer Martin suspected a crime does not preclude the application of the inventory search exception *if* the inventory search was properly completed. *United States v. Morris*, 915 F.3d 552, 557 (8th Cir. 2019) ("[W]hen police are conducting inventory searches according to such standardized policies, they may keep their eyes open for potentially incriminating items that they might discover in the course of an inventory search, as long as their sole purpose is not to investigate a crime."). But Officer Martin is prohibited from conducting an investigatory search under the guise of an inventory search. *United States v. Kennedy*, 427 F.3d 1136, 1144 (8th Cir. 2005) ("The Constitution does not permit police to raise the inventory-search banner in an after-the-fact attempt to justify what was purely and simply a search for incriminating evidence.") (internal quotations and citations omitted).

An inventory search will be considered reasonable if the "inventory search is conducted according to standardized police procedures, which generally remove the inference that the police have used inventory searches as a purposeful and general means of discovering evidence of a crime." *Morris*, 915 F.3d at 557 (citing *Taylor*, 636 F.3d at 464). Under the Policy, police officers may impound a car when it "appears appropriate for the safekeeping of the vehicle and its contents, to protect them from theft and damage and to protect the MPD from claims of mishandling." (R&R at 39–40.) In furtherance of this purpose, the police officer must also inventory the items within the car. (*Id.*) Officer Martin did not follow the Policy when searching Rolenc's car because he did not inventory the contents of Rolenc's car and did not list the reason for the tow. (R&R at 38–39.) Rolenc reported having a valuable item in the car, and this was still not recorded on the inventory sheet. (*Id.*; Def. Ex. 16.)

Officer Martin's failure to follow policy is not inherently unconstitutional; there must be "something else" that suggests pretext. *Taylor*, 636 F.3d at 465; *see Morris*, 915 F.3d at 557 ("Even if police fail to adhere to standardized procedures, the search is nevertheless reasonable provided it is not a pretext for an investigatory search.") (citation omitted); *Rowland*, 341 F.3d at 780 ("Compliance with procedures merely tends to ensure the intrusion is limited to carrying out the government's care-taking function. There must be something else; something to suggest the police raised the inventory-search banner in

an after-the-fact attempt to justify a simple investigatory search for incriminating evidence.") (internal quotations and citations omitted).

In *United States v. Taylor*, the officers did not comply with the police department standardized procedures, and one officer's testimony provided "something else" to suggest the search of the defendant's car was for investigatory purposes. 636 F.3d at 463. The government in *Taylor* relied on the inventory search exception to justify the warrantless search, but the officer in *Taylor* testified that the basis of the traffic stop, the arrest, the towing of the vehicle, and the inventory search was the officer's belief that the defendant had narcotics in his vehicle. *Id.* at 465–66. The officer testified that she would not have arrested the defendant, impounded his vehicle, or inventoried the contents of his truck if not for the belief that the vehicle contained evidence of a crime. *Id.* at 465. The court concluded that the search was "conducted because police believed they would find evidence . . . and thus the inventory was *merely a pretext* for an investigatory search." *Id.* (emphasis added).

Here, the officers' search was clearly for investigatory, not inventory, purposes. Officer Martin testified that the search was one incident to arrest, and he described it as such in his reports. (*See* R&R at 38-39 (report noting "[s]earch incident to arrest of the immediate area").) Officer Martin testified that the "decision to tow was made after the firearm and cash were found in the vehicle." (R&R at 36.) The tow sheet failed to list Rolenc's personal property in the car and the reason for the tow contrary to the Policy.

(*Id.* at 38; Def. Ex. 16.) And the officers only discussed towing the car and inventorying the items in the car after the money and the firearm were found. (R&R at 37–38.) Although Officer Martin may have "assumed" Rolenc's car would eventually be towed, the evidence overwhelmingly shows that the search was solely conducted because the officers believed they would find evidence. (*Id.* at 35.)

For the search to qualify as an inventory search, Officer Martin must have *intended* the search *to be* an inventory search; an inventory search cannot be a "purposeful and general means of discovering evidence of a crime." *Taylor*, 636 F.3d. at 465 (citing *Marshall*, 986 F.2d at 1174); *see Opperman*, 428 U.S. at 375–76 (finding that an inventory search was "not 'unreasonable' under the Fourth Amendment" when the police were "indisputably engaged in a caretaking search of a lawfully impounded automobile") (citations omitted).

The search of Rolenc's car during the July 2020 stop was not conducted pursuant to the inventory search exception. Because the police officers did not have probable cause to search the car and because no other exception applies, this Court must grant Rolenc's second motion and suppress the evidence recovered as a result of this unconstitutional search.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.   The government's objection (ECF No. 85) is OVERRULED;

2.   Defendant's objection (ECF No. 81) is SUSTAINED;

3.   The Report and Recommendation (ECF No. 77) is ACCEPTED IN PART as modified in this order;

4.   Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (ECF No. 26) is GRANTED IN PART and DENIED IN PART. The Motion (ECF No. 26) is granted insofar as Defendant seeks suppression of:

     a.   All evidence seized from Defendant and his car as a result of the February 2, 2020 traffic stop;

     b.   All evidence seized in a search pursuant to warrant of a silver VW Jetta with MN license plate 649-XEX in a police impound lot on February 4, 2020, following the Jetta's seizure during the February 2, 2020 traffic stop; and

     c.   All evidence seized in a search pursuant to warrant of three cell phones seized during the February 2, 2020 traffic stop.

          The Motion (ECF No. 26) is denied as to its remainder.

5.   Defendant's Second Motion to Suppress Evidence Obtained as a Result of

Search and Seizure (ECF No. 57) is GRANTED.


Dated: October 15, 2021                          BY THE COURT:

                                                 s/Nancy E. Brasel
                                                 Nancy E. Brasel
                                                 United States District Judge